IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| STANLEY CRUMP, | : | CIVIL ACTION |
| | : | NO. 14-4671 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HF3 CONSTRUCTION, INC., et al., | : | |
| | : | |
| Defendants. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    November 29, 2016


        This is a Fair Labor Standards Act ("FLSA") case in
which Plaintiffs Stanley Crump and Jermaine Woodson allege that
they are entitled to overtime pay they did not receive from
Defendants DHF Associates, HF3 Construction, Inc., and those
companies' owners. Defendants, in turn, argue that Plaintiffs
were not employed by Defendants. Plaintiffs have now moved for
summary judgment. For the reasons that follow, the Court will
deny the motion.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

        Defendant DHF Associates ("DHF") is a fireproofing
company owned by Defendant Herbert Fletcher, Sr. ("Fletcher,

Sr."). Pls.' Statement Material Facts ¶¶ 1-2, ECF No. 21-2. Fireproofing involves spraying structures, such as steel structural beams, with incombustible plasters. Id. ¶ 6. Fletcher, Sr. and his nephew, Darren Coleman, performed the labor on DHF's first fireproofing job, but on every job since then, Courtney Sanders and several individuals working under Sanders's supervision have performed the labor. Id. ¶¶ 20, 23; Defs.' Mem. Law at 2-6, ECF No. 22.

Defendant HF3 Construction, Inc., is a general construction company owned by Defendant Herbert Fletcher, II ("Fletcher, II"); its work includes fireproofing. Pls.' Statement Material Facts ¶¶ 42-43. Fletcher, II has performed the labor on some HF3 fireproofing jobs himself, while Sanders and individuals working under his supervision have performed the labor on the remainder. Id. ¶ 45.

The parties dispute Sanders's and the other laborers' statuses with DHF and HF3: Plaintiffs (who are several of the laborers) contend that they and Sanders were employed by DHF and HF3, id. ¶¶ 23, 45, while Defendants say that Sanders was never an employee of DHF or HF3, and instead was an independent contractor, and that the other laborers were employed by Sanders, not by DHF and HF3, Defs.' Mem. Law at 2-3, 9-10.

At any rate, it is undisputed that Plaintiffs Stanley Crump and Jermaine Woodson have worked as laborers under

2

Sanders. Id. ¶ 80. Plaintiffs argue, further, that they worked
specifically on DHF and/or HF3 jobs. Pls.' Statement Material
Facts ¶¶ 66, 75. And, they say, Defendants failed to pay them
overtime premiums for hours they worked in excess of forty (40)
per week. Id. ¶¶ 72, 79.

Plaintiff Crump filed a Complaint on August 8, 2014,
on behalf of himself and those similarly situated. ECF No. 1.
The Complaint contains three counts, all concerning Defendants'
alleged failure to pay overtime wages: (1) violations of the
Fair Labor Standards Act ("FLSA"); (2) violations of the
Pennsylvania Minimum Wage Act ("PMWA"); and (3) violations of
the Pennsylvania Wage Payment and Collection Law ("PWPCL").
Shortly thereafter, Crump filed notice that Woodson had opted
into this lawsuit. ECF No. 3. No other parties joined and
Plaintiffs did not move to certify a class. Defendants then
filed an Answer, ECF No. 4, and the parties entered into
discovery.

On December 24, 2015, Plaintiffs filed the instant
Motion for Partial Summary Judgment. ECF No. 21. Defendants
filed a Response on January 7, 2016. ECF No. 22. Plaintiffs then
filed a Motion for Leave to File Reply, ECF No. 24, which the
Court will grant. The Motion for Partial Summary Judgment is now
ripe for disposition.

## II.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). In short, the essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

4

## III. DISCUSSION

Plaintiffs contend that they are entitled to summary judgment as to: (1) Defendants' statutory liability; (2) Fletcher, Sr. and Fletcher, II's individual liability; and (3) liquidated damages under the FLSA.[1] Each of these claims depends on the determination that Plaintiffs were employees of Defendants: as Plaintiffs implicitly acknowledge, Defendants could not have violated the law[2] if Plaintiffs were not their employees – and if Defendants did not violate the law, there is also no basis for liquidated damages. See Cherichetti v. PJ Endicott Co., 906 F. Supp. 2d 312, 316 (D. Del. 2012) ("Under the FLSA, an independent contractor is not protected; the FLSA applies only to employees of covered employers.").

Thus, the Court must first consider whether Plaintiffs were employees of Defendants. Plaintiffs' employment status is a legal conclusion, Martin v. Selker Bros., Inc., 949 F.2d 1286, 1292 (3d Cir. 1991), but if there are genuine disputes as to

---

[1]     Plaintiffs style their motion as a "Motion for Partial Summary Judgment," but do not explain which claims or portions of claims they are not presently seeking judgment on. (Presumably, it is the amount of damages, which they do not appear to address here.)

[2]     It is worth noting that Plaintiffs do not actually identify the relevant portions of the Pennsylvania statutes, and misidentify the relevant portion of the FLSA (pointing to 29 U.S.C. § 207(a)(3), which concerns the amount of compensatory time an employee may accrue from certain work environments, instead of § 207(a)(1), which requires overtime pay).

material facts underlying that conclusion, Plaintiffs' motion for summary judgment must be denied in full.

The FLSA defines the relevant terms expansively and circuitously: an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employer," in turn, is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." § 203(d). "There is no single test to determine whether a person is an employee or an independent contractor for purposes of the FLSA." Martin, 929 F.2d at 1293. Certainly, an employer's labels are not determinative, particularly where an employer has used the label of "independent contractor." See Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA].") . Rather, courts must analyze the "circumstances of the whole activity," id. at 730, particularly the "economic realities of the relationship" between the purported employer and purported employee, Martin, 949 F.2d at 1293. See also Haybarger v. Lawrence Cty. Adult Probation & Parole, 667 F.3d 408, 418 (3d Cir. 2012) ("As we recognized in applying the economic reality test in the context of the FLSA, whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts

6

of the employment relationship.'" (quoting <u>Hodgson v. Arnheim & Neely, Inc.</u>, 444 F.2d 609, 612 (3d Cir. 1971), <u>rev'd on other grounds by</u> <u>Brennan v. Arnheim & Neely, Inc.</u>, 410 U.S. 512 (1973))). The Third Circuit has held that courts should consider the following six factors in that analysis:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

<u>Donovan v. DialAmerica Mktg., Inc.</u>, 757 F.2d 1376, 1382 (3d Cir. 1985). Pennsylvania courts use this same test to determine whether an individual is an employee for the purposes of the Minimum Wage Act. <u>See</u> <u>Commonwealth v. Stuber</u>, 822 A.2d 870, 873-74 (Pa. Commw. Ct. 2003), <u>aff'd</u>, 859 A.2d 1253 (Pa. 2004).

As an initial matter, before analyzing the six factors, Plaintiffs contend that Fletcher, Sr. <u>admits</u> to having employed Plaintiff Crump. Specifically, Plaintiffs point to Fletcher's testimony regarding a single DHF fireproofing job at the BWI Airport in 2013. Fletcher, Sr. testified that with respect to the BWI job, he was required to give to the general contractor (Hunt Construction Company) weekly "payroll certificate[s]." Fletcher, Sr. Dep. 67:11-68:12, Oct. 1, 2015,

ECF No. 21-3. On those payroll certificates, Fletcher, Sr. agreed, with his signature, that he "pa[id] or supervise[d] the payment of the persons employed by DHF Associates" on the BWI job. Pls.' Mot. Partial Summ. J. Ex. D, ECF Nos. 21-6, 21-7. He also purportedly provided the names, addresses, and Social Security numbers of those on DHF's payroll for the BWI job. See id. However, Fletcher, Sr. testified that he "actually made up" some of the names that he listed on these payroll certificates. Fletcher, Sr. Dep. 67:15-20. One of those names was "given for [Plaintiff] Stanley Crump," whom Fletcher, Sr. was aware was working at the site.[3] Id. at 74:5-13. That is, Fletcher, Sr. certified to Hunt Construction Company that he paid individuals who did not work the BWI job for their (nonexistent) work on the BWI job.

Plaintiffs now argue that these payroll certifications amount to admissions that Fletcher, Sr. employed Crump. In other words, Plaintiffs ask the Court to treat Fletcher, Sr.'s admittedly false certifications as true admissions.[4] Viewing

---

[3] Meanwhile, Fletcher, Sr. claimed during his deposition that he had never heard of Woodson. Fletcher, Sr. Dep. 54:20-55:5.

[4] Because the certifications do not actually contain Stanley Crump's name, Plaintiffs also ask the Court to, in effect, read Crump's name into the documents because Fletcher, Sr. has admitted that one of the false names was meant to represent Crump.

these certifications in the light most favorable to Defendants, such a conclusion would reach too far. There are multiple apparent falsehoods on the certifications – besides Fletcher, Sr.'s use of false names to represent those working the BWI job, the certifications also state that the individuals listed were on DHF's payroll, which, it seems, they were not. In fact, the certifications list the amounts deducted (in taxes, etc.) from each person's paycheck – which, because those individuals were not on the payroll and were not actually receiving official paychecks,[5] were necessarily falsified. It also appears that the certifications contained false hourly rates. <u>Compare</u> Pls.' Mot. Partial Summ. J. Ex. D (containing hourly rates in the $50-100 range) <u>with</u> Woodson Dep. 28:4-16, Oct. 8, 2015, ECF No. 22-4

---

[5]      It is unclear how, exactly, Crump and Woodson were paid. Conceivably, they may have discussed this issue during their depositions, but no party has filed the full transcript of either deposition. Defendants did file a very brief excerpt from Crump's deposition, in which Crump says that he was paid under the table and "received [his pay] in cash in envelopes." Crump Dep. 17:13-20, Oct. 8, 2015, ECF No. 22-3. The excerpt ends before Crump finishes explaining how he was paid.

Defendants claim that Sanders paid Crump and Woodson, though they do not explain how. Defs.' Mem. Law at 3, ECF No. 22.

Plaintiffs did file, as exhibits, records of payments to Sanders (who, again, is not a party to this case), but those records are simply photocopies of checks made out to Courtney Sanders from DHF, Incorporated. They are personal checks rather than payroll checks; they are handwritten and the amounts vary wildly, with no indication of any legal deductions. <u>See generally</u> Pls.' Mot. Partial Summ. J. Ex. H, ECF Nos. 21-11; 21-12; 21-13.

(claiming that he was promised $25 per hour[6]) and Fletcher, Sr.
Dep. 74:18-75:16 (recalling that the hourly rates on the payroll
certifications differed from what "Courtney was paying").

Therefore, it is entirely reasonable to read the
payroll certifications as largely, if not wholly, fictitious
documents, intended to serve some unknown purpose[7] beyond
actually reflecting the economic realities of Defendants'
relationship with Plaintiffs (who, again, are not even named on
the certifications).[8] In this way, this case is distinct from
several Plaintiffs cite in support of their argument that
Fletcher, Sr.'s certifications are "highly probative"

---

[6]     Sanders also swore in an affidavit that he paid
Woodson $25 per hour. Sanders Aff. ¶¶ 14, 16, ECF No. 22-1.

[7]     Plaintiffs suggest that Fletcher, Sr. falsified the
certifications in order to obtain the benefits of a "prevailing
wage contract." Pls.' Reply Mem. Law at 1, ECF No. 24-1.
Plaintiffs do not explain what a prevailing wage contract is, or
its significance to this case.

[8]     Notably, this single example – the BWI job – has
nothing to do with HF3 or Fletcher, II. And Plaintiffs' argument
that the certifications are representative of Defendants'
relationships with Plaintiffs on every job is further unavailing
when the certifications appear to be false in several material
respects, and thus do not seem to represent the parties' actual
relationship.

Moreover, Fletcher, Sr. testified that these payroll
certifications were unique to the BWI job; he did not have to
submit such documents to any other general contractor. Fletcher,
Sr. Dep. 76: 4-11.

admissions.[9] Most notably, Plaintiffs cite <u>Farlow v. Wachovia</u> <u>Bank of North Carolina, N.A.</u>, 259 F.3d 309 (4th Cir. 2001), for the proposition that "[a] party's tax and benefit treatment can be 'virtual admissions' of the party's status." <u>Id.</u> at 315 (quoting <u>Aymes v. Bonelli</u>, 980 F.2d 857, 862 (2d Cir. 1992)); <u>see also</u> <u>In re Fedex Ground Package Sys., Inc.</u>, No. 3:05-MD-527 RM (MDL-1700), 2006 WL 3755311, at *2 (N.D. Ind. Dec. 14, 2006) (quoting <u>Farlow</u> for the same proposition). But the Fourth Circuit's point in <u>Farlow</u> was actually that purported employees are more likely to be independent contractors if the hiring party does not extend them employment benefits or pay any payroll taxes. <u>See</u> <u>Farlow</u> at 315. Here, in contrast, the so-called "admission" at issue is not Defendant's <u>actual</u> tax and benefit treatment of Plaintiffs, but rather, false statements Fletcher, Sr. made about his tax treatment of Plaintiffs. Moreover, under <u>Farlow</u>, if Defendants did not deduct payroll taxes from Plaintiffs' paychecks, Plaintiffs are <u>less likely</u> to have been employees of Defendants. And indeed, Plaintiffs do not argue that DHF or Fletcher, Sr. <u>actually</u> deducted taxes from their paychecks – only that Fletcher, Sr. <u>claimed</u> to do so on

_____

[9]     See <u>Brock v. Superior Care, Inc.</u>, 840 F.2d 1054, 1059 (2d Cir. 1988) ("Though an employer's self-serving label of workers as independent contractors is not controlling, an employer's admission that his workers are employees covered by the FLSA is highly probative." (citation omitted)).

11

documents that are undisputedly false.

Accordingly, the Court declines to find the payroll certifications "highly probative" of Plaintiffs' employment statuses and will now proceed to analyze the six factors set forth by the Third Circuit in Donovan.

In this case, Plaintiffs repeatedly argue that they must have been employed by Defendants because Courtney Sanders was employed by Defendants, and Plaintiffs worked under Sanders. The majority of the evidence they point to in their motion for summary judgment concerns Sanders, not Plaintiffs, and Plaintiffs never fully or satisfactorily explain why Sanders's employment status is necessarily dispositive of their own. In turn, Defendants argue not that Plaintiffs were entirely independent contractors, but rather, that they were employees of Sanders, who they say was an independent contractor, rather than an employee of Defendants.

Even taking as true Plaintiffs' argument's basic premise – that if Sanders was an employee of Defendants, Plaintiffs must have been employees as well – and analyzing the six Donovan factors accordingly, genuine issues of material fact remain.

A.    Degree of Control

The first factor is "the degree of the alleged

employer's right to control the manner in which the work is to
be performed." Donovan, 757 F.2d at 1382. "[E]vidence relevant
to evaluate this factor includes the degree of supervision over
the worker, control over the worker's schedule, and instruction
as to how the worker is to perform his or her duties." Bamgbose
v. Delta-T Grp., Inc., 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010)
(citing Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d
668, 675-76 (1st Cir. 1998)).

        According to Plaintiffs, the "undisputed facts in the
record" demonstrate that Defendants: (1) "directed Supervisor
Sanders when and where to work"; (2) provided Sanders "with
details on how to perform the fireproofing labor"; (3) and
reprimanded Sanders "regarding his performance of assigned work
on multiple occasions." Pls.' Mem. Law at 9, ECF No. 21-1. But
the facts in the record are not quite that clear – or that
meaningful.

        First, as to the claim that Defendants "directed
Supervisor Sanders when and where to work," Plaintiffs point to
two brief portions of Fletcher, II's deposition testimony. (They
do not point to any evidence regarding Fletcher, Sr. or DHF.)
First, Fletcher, II testified that when Sanders did a
fireproofing job for DHF, Fletcher, II gave him the drawings of
the structure to be fireproofed, as well as the address of the
job. Fletcher, II Dep. 29:23-30:17, Oct. 1, 2015, ECF No. 21-8.

And second, Fletcher, II said that the general contractor on any given job would decide when Sanders should do the work, and Fletcher, II would relay that information to Sanders. <u>Id.</u> at 44:18-22. Viewing these pieces of testimony in the light most favorable to Defendants, they do not serve as undisputed evidence that Defendants had significant control over the manner in which Sanders was to do his work. Rather, they make Fletcher, II appear like a middle man of sorts, passing on information from the general contractor but making none of the decisions himself.

Second, Plaintiffs point to the same two pieces of testimony – and no others – in support of their claim that Defendants provided Sanders "with details on how to perform the fireproofing labor." Viewing this testimony in the light most favorable to Defendants – or any light, really – it says no such thing. Again, Fletcher, II testified that before each job, he gave Sanders drawings of the structure at issue, the address of the job, and the days on which he was to work. Nowhere in the testimony cited did he say that he gave Sanders any instructions about how to actually perform the fireproofing labor.[10]

Third, in support of their claim that Defendants, on multiple occasions, reprimanded Sanders for his performance on

---

[10] Nor did he testify that he gave any instructions, even in an attenuated way, to Plaintiffs themselves.

14

job sites, Plaintiffs cite one excerpt from Fletcher, II's
deposition and one excerpt from Fletcher, Sr.'s deposition.
Fletcher, II testified that when Sanders did not show up to work
on days the general contractor wanted Sanders to be there,
Fletcher, II would "have conversations with [Sanders] about
that." Id. at 43:5-20. He did not describe the content of those
conversations. And Fletcher, Sr. testified that when he received
complaints about Sanders from general contractors, he would
"ha[ve] a conversation" with Sanders and tell Sanders to "take
care of it by contacting" the contractor himself. Fletcher, Sr.
Dep. 55:9-57:15.[11] Viewed in the light most favorable to
Defendants, then, these pieces of testimony do not support
Plaintiffs' claim that Defendants had a significant degree of
control over the manner in which Sanders did his work, much less
the manner in which Plaintiffs did their work.

Meanwhile, other portions of testimony cited by
Plaintiffs also do not clearly support – or actually weigh
against – Plaintiffs' claim that Defendants controlled their
work. Specifically, Plaintiffs say that Fletcher, Sr. and
Fletcher, II "visited the worksites to monitor the progress of
the work." Pls.' Mem. Law at 9. While Fletcher, II did testify

---

[11]     Moreover, the summary judgment record appears to be
silent as to whether Plaintiffs, rather than Sanders, ever
failed to show up on the days they were supposed to, and if so,
what was done about it.

that he visited worksites to check the progress of the work (and
to collect payments), Fletcher, II Dep. 27:13-28:24; 40:3-17,
Plaintiffs do not explain how "checking progress" necessarily
means that Fletcher, II had a significant degree of control over
the way Sanders or Plaintiffs were doing the work. And Fletcher,
Sr.'s testimony is not any better for Plaintiffs: though he did
testify that "sometimes" he would visit a job site "to make sure
everything is being done correctly," he also testified that
sometimes he would go simply "because [he had] nothing else to
do" and "just want[ed] to get away for the day." Fletcher, Sr.
Dep. 62:12-63:4. More specifically, he discussed his visit to
the BWI job: He visited that job site about three times over
five months, always to collect payments from the general
contractor, _not_ to visit Sanders or the other laborers. _Id._ at
79:13-80:6. And while he would briefly see the workers in the
course of his visits – he saw Crump twice, he thought, and
exchanged pleasantries with him – Fletcher, Sr. "wasn't there
for" Sanders and the others. _Id._ at 80:3-82:6. In fact,
Fletcher, Sr. was not even permitted on the work site and had to
be escorted – by Sanders – to the contractor's trailer. _Id._
Viewed in the light most favorable to Defendants, these facts do
not support the conclusion that Defendants had a meaningful
amount of control over the manner in which Sanders or Plaintiffs
did their work.

Finally, the record is also unclear as to the amount
that Plaintiffs had "real independence" from Defendants. Usery
v. Pilgrim Equipment Co., Inc., 527 F.2d 1308, 1312 (5th Cir.
1976). Plaintiffs claim that "Defendants possessed the business
licenses and certifications necessary to perform fireproofing
jobs." Pls.' Mem. Law at 9. But in the deposition testimony they
point to, Fletcher, Sr. testified that his fireproofing
certification applied to him personally, not to DHF, Fletcher,
Sr. Dep. 24:13-15; that he did not have a certification from all
of the manufacturers DHF used, id. at 25:10-26:11; and that
certification is not actually necessary to use fireproofing
materials, id. at 28:2-5. Similarly, Fletcher, II testified that
while he was advised by a materials manufacturer that "it would
be a good idea" to take the manufacturer's certification course,
he was not told that it was required in order to purchase the
materials, and HF3 used materials from a manufacturer that had
not certified HF3. Fletcher, II Dep. 15:24-17:7. Accordingly, on
this record, Plaintiffs have not established that they relied on
Defendants' certifications in order to do their work. However,
Defendants' business licenses may be relevant: both Fletcher,
Sr. and Fletcher, II testified that DHF and HF3 needed – and
possessed – business licenses in order to do fireproofing work.
See Fletcher, Sr. Dep. 28:6-24; Fletcher, II Dep. 21:15-22:6.
But Defendants' argument is that Plaintiffs were employed by

17

Sanders, not by Defendants – and the record does not show whether or not Sanders also had the requisite business licenses.[12] Accordingly, the importance of Defendants' business licenses is not established at this time.[13]

Therefore, after construing the record – which is currently short on relevant facts – in the light most favorable to Defendants, a reasonable jury could determine that Defendants did not have a significant degree of control over the manner in which Sanders or Plaintiffs did the assigned work. Accordingly, genuine issues of fact remain as to this factor.

B.   Plaintiffs' Opportunities for Profit or Loss

The second factor is "the alleged employee's opportunity for profit or loss depending upon his managerial skill." Donovan, 757 F.2d at 1382. "An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308,

---

[12]   Fletcher, II specifically testified that he did not know whether Sanders had business licenses. See Fletcher, II Dep. 22:7-11.

[13]   Similarly, though it is true that Defendants did the work of contacting general contractors to obtain fireproofing jobs for DHF and HF3, see Fletcher, Sr. Dep. 41:21-42:5; Fletcher, II Dep. 22:21-23:2, that fact alone does not establish the degree of control Defendants had over the manner in which Plaintiffs did the work.

1317 (11th Cir. 2013). If a worker's profits are based on his own efficiency – if, for example, he makes more money if he simply does more work – he is more likely to be an employee. See id. (citing Rutherford Food, 331 U.S. at 730).

The record is almost entirely devoid of undisputed facts relating to this factor. It is clear that Plaintiffs were paid by some hourly rate, but it is not clear who set that rate or whether it was subject to change for any reason. Moreover, to the extent that – as Plaintiffs' basic argument requires – the question at issue is really whether Sanders, rather than Plaintiffs, had the opportunity for profit or loss based upon his managerial skill, the facts are far from clear. It is true that HF3, at least, usually acquired the materials Sanders used for HF3 fireproofing jobs,[14] see Fletcher, II. Dep. 25:9-26:11,[15] which, at least one court has found, may point toward someone having been an employee. Solis v. Cascom, Inc., No. 09-257, 2011 WL 10501391, at *6 (S.D. Ohio Sept. 21, 2011) ("While the

---

[14]     Plaintiffs also allege that DHF bought the materials for DHF jobs, but they point to Fletcher, Sr. deposition testimony that supports only the narrower claim that DHF has bought fireproofing materials – not that DHF bought all of the fireproofing materials Sanders used. Fletcher, Sr. Dep. 25:3-14. (They also cite to "DHF Job Profiles," which state the suppliers of the materials used, but not who ordered the materials. See generally Pls.' Mot. Summ. J. Ex. C, ECF No. 21-5.)

[15]     Fletcher, II could not recall whether or not Sanders ever paid for the materials himself. Fletcher, II Dep. 26:9-11.

alleged employees were free to work additional hours to increase
their income, they had no decisions to make regarding routes, or
acquisition of materials, or any facet normally associated with
the operation of an independent business."). But at the same
time, according to Fletcher, Sr. and Fletcher, II, Sanders would
tell them how much he wanted to be paid for any given job, and
they might negotiate his number from there. Fletcher, II Dep.
24:3-21; Fletcher, Sr. Dep. 51:19-54:5. That testimony adds
little to the record on this factor, and does not clarify
whether Sanders, like Plaintiffs, was paid an hourly rate and
whether his pay was subject to change for any reason within his
own control.

Moreover, it is undisputed that Sanders selected and
managed the laborers who would be working under him without
input from Defendants. See, e.g., Fletcher, Sr. Dep. 54:20-55:8
(testifying that, apart from information he learned through this
lawsuit, he does not know who worked under Sanders on DHF jobs,
and at the time never asked Sanders who he was working with);
Fletcher, II Dep. 26:12-18 (testifying that Sanders never told
him how many man hours a job would require or how many people
"he would be using on the job"). Indeed, though Plaintiffs do
not explicitly concede as much, it even appears that Sanders may
have paid Plaintiffs. See Sanders Aff. ¶¶ 10, 14, 16, ECF No.
22-1 (declaring that he paid Crump and Woodson for their work in

amounts they agreed upon); Fletcher, Sr. Dep. 75:6-16

(commenting about how much he thought Sanders was paying the

laborers on the BWI job).[16] If true, it is reasonable to infer

that Sanders's opportunity for profit depended in part upon his

choices concerning his management of Plaintiffs,[17] which weighs

toward Sanders having been an independent contractor.

Accordingly, genuine issues of fact also remain

concerning this second factor.

C.   Plaintiffs' Investment in Equipment

The third factor is "the alleged employee's investment

in equipment or materials required for his task, or his

employment of helpers." Donovan, 757 F.2d at 1382. Again, the

ultimate question is whether Plaintiffs, not Sanders, were

employees – but, as to this factor, the narrower question

essentially concerns Sanders's status, not Plaintiffs', as

neither Plaintiffs nor Defendants argue that Plaintiffs invested

in equipment/materials or employed helpers. Rather, the dispute

is about whether Sanders did so.

---

[16]     Plaintiffs conspicuously do not argue that Sanders did
not pay Plaintiffs for their work.

[17]     These choices would have included how much to pay
them. That is, it appears from the record that Defendants may
have simply written a check to Sanders for each job, and Sanders
would pay the other laborers out of that check. Sanders's
profit, therefore, would depend in part upon his choices about
how many laborers to hire and how much to pay them.

As to relative investments in equipment, the record is, again, mixed. For his part, Sanders claims that he "provided equipment for [his] team on the jobsites." Sanders Aff. ¶ 17. He does not explain whether he owned or rented this equipment, though he does say that he occasionally borrowed equipment from his brother, Chester Sanders, "who also worked on the team." Id. He also does not say whether, if he rented the equipment, the cost of renting was factored into his pay from Defendants (in which case his "investment" would be less significant).[18] Plaintiffs, on the other hand, point out that it was Defendants who leased the offices and purchased the fireproofing materials used on DHF and HF3 jobs. Pls.' Mem. Law at 11. They also argue that DHF and HF3 at least sometimes rented the equipment used by Sanders and the other laborers, though again, the documents to which they cite are less decisive than they claim. See Pls.' Mot. Summ. J. Ex. C. at DEF000003 (noting that a mixer and forklift were rented for a DHF job, but not stating whether DHF or Sanders rented them); see also Fletcher, Sr. Dep. 38:14-39:4 (testifying that Sanders, not DHF or Fletcher, Sr., "own[ed]" the necessary equipment for every DHF job). Therefore, the facts concerning equipment do not clearly favor either side.

---

[18]     Fletcher, II testified that he did not know whether Sanders owned or rented the equipment he used. Fletcher, II Dep. 20:15-22.

22

However, as discussed above, the facts – viewed in the light most favorable to Defendants – do suggest that Sanders employed helpers. In effect, it appears that Fletcher, Sr. or Fletcher, II would ask Sanders to do a job for DHF or HF3. They would negotiate Sanders's pay, and Sanders would then select laborers to help him with the job – and he would pay them out of the check he would receive from DHF or HF3. At the least, these facts remain disputed; Plaintiffs have failed to establish otherwise. These facts thus weigh toward a finding that Plaintiffs were employees of Sanders, not Defendants.

Accordingly, there are also genuine issues of fact as to this factor.

D.    Requirement of Special Skill

The fourth factor is "whether the service rendered requires a special skill." Donovan, 757 F.2d at 1382. "[T]he use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way." Martin, 949 F.2d at 1295.

In Brock v. Superior Care, Inc., 840 F.2d 1054 (2d Cir. 1988) – which the Third Circuit cited approvingly in Martin, 949 F.2d at 1295 – the question was whether certain nurses were employed by a corporation that referred them to patients and health care institutions. The Second Circuit

determined that the skill factor weighed somewhat in favor of independent contractor status – but not significantly so, because the nurses, while highly skilled, did not use their skills "in any independent way" and "depended entirely on referrals to find job assignments." Id. at 1060. Moreover, the corporation "controlled the terms and conditions of the employment relationship." Id.

Here, first of all, the record appears to be silent as to the amount of skill Plaintiffs needed in order to do their fireproofing work (presumably, they were less skilled than the nurses in Brock, but neither Plaintiffs nor Defendants say one way or the other). At any rate, there is no indication in the record that Plaintiffs used their skills in any independent way. But that does not make clear that they were employees of Defendants: the question, of course, is whether they depended on Defendants or on Sanders to "find job assignments." Id. Viewing the record in the light most favorable to Defendants, it appears that the answer is Sanders – although it is also true that Sanders, in turn, apparently depended on Defendants to secure the jobs at issue. See Fletcher, Sr. Dep. 50:13-15 (testifying that DHF "contracted" Sanders to do every job that DHF managed to secure). But, either way, it cannot be said at this time that Defendants clearly "controlled the terms and conditions" of their relationship with either Plaintiffs or Sanders. Brock, 840

24

F.2d at 1060.

Accordingly, genuine issues of fact remain as to this factor.

E.    Degree of Permanence

The fifth factor is "the degree of permanence of the working relationship." Donovan, 757 F.2d at 1382. In Donovan, the Third Circuit noted that this factor weighed in favor of employee status because the alleged employees "did not transfer their services from place to place, as do independent contractors. Each worked continuously for the defendant, and many did so for long periods of time." Id. at 1385 (citation omitted). Thus, the question is whether Plaintiffs' relationship with Defendants was "a transitory one." Id. at 1384.

This factor is perhaps where the record is least helpful. The brief excerpts provided from Crump and Woodson's depositions are silent on the matter.[19] And Fletcher, Sr. testified that he believed Sanders did work for other companies because DHF did not have steady work for Sanders, and sometimes Sanders would tell Fletcher, Sr. that he was busy with a job for another contractor when Fletcher, Sr. called about work. See

---

[19]    Crump and Woodson's affidavits are also silent about whether they did fireproofing work for other companies. See Pls.' Mot. Summ. J. Exs. F, G, ECF Nos. 21-9, 21-10. Notably, Woodson alleges that he did work for DHF and HF3 for only about five months. Woodson Aff. ¶ 3, ECF No. 21-10.

Fletcher, Sr. Dep. 50:16-51:12.

These facts are woefully insufficient to support summary judgment in favor of Plaintiffs.[20] Accordingly, genuine issues of fact remain as to the degree-of-permanence factor.

F.   Importance of Service Rendered to Defendants'
     Businesses

The sixth and final factor is "whether the service rendered is an integral part of the alleged employer's business." Donovan, 757 F.2d at 1382. This factor "relates not to the percentage of total work done by the workers at issue but to the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business?" Id. at 1385. That is, "regardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." Id.

Here, DHF is a fireproofing company that performed only fireproofing jobs. See Fletcher, Sr. Dep. 14:10-18. Thus,

---

[20]     Plaintiffs contend that it is relevant that Sanders received a check from either DHF or HF3 during 48% of the 156 weeks apparently at issue in this case. Pls.' Mem. Law at 14. But even assuming that Plaintiffs' math is otherwise correct, DHF and HF3 are separate entities; Plaintiffs cannot simply lump them together to reach the significant-sounding number of 48% and declare it dispositive as to both companies. Moreover, Plaintiffs completely ignore the critical question of whether Sanders and/or Plaintiffs also worked for other fireproofing companies during that time period.

the service Plaintiffs rendered is clearly an integral part of
DHF's business. This factor is less clear as to HF3, however –
Fletcher, II estimated that fireproofing made up only 10% of
HF3's revenue, and stated that the business was "much more
general construction than fireproofing." Fletcher, II Dep.
11:22-12:16.

Accordingly, this factor clearly weighs in favor of
employment as to Plaintiffs' statuses with DHF and Fletcher,
Sr., but weighs only slightly in favor of employment, if at all,
as to Plaintiffs' statuses with HF3 and Fletcher, II.

• • •

In summary, Plaintiffs have failed to establish that,
as a matter of economic reality, they were necessarily
"dependent upon" DHF and/or HF3 "for their continued
employment." Donovan, 757 F.2d 1385 (quoting Donovan v. Sureway
Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981)). To the contrary,
on the record provided at this stage, a reasonable jury could
find that Plaintiffs were dependent upon Sanders, but not
Defendants, for their continued employment.[21] For this and other
reasons, as detailed above, there remain genuine issues of fact
concerning whether Plaintiffs were employees of Defendants –

---

[21]     Plaintiffs' near-total failure to present evidence
concerning work they did or did not do outside of DHF and/or HF3
jobs is significant here.

27

and, because Plaintiffs must prove that they were employed by Defendants in order to prevail on any of their claims, those facts are also material.[22] See Anderson, 477 U.S. at 248 (explaining what "genuine" and "material" facts are). That is, "the evidence presents a sufficient disagreement to require submission to a jury"; it is not "so one-sided that [Plaintiffs] must prevail as a matter of law." Id. at 251-52. The Court thus deny in full Plaintiffs' Motion for Partial Summary Judgment.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Partial Summary Judgment. An appropriate order follows.

---

[22] It is conceivable that, under different circumstances, a party might be entitled to summary judgment even if genuine issues of fact remained as to, say, one of the six economic-reality factors. Under those circumstances, perhaps the remaining factor would not impact the analysis enough to affect the result; if so, those issues of fact would be immaterial. But here, genuine issues of fact remain as to five of the six factors, as well as the general question of economic dependence. With so much uncertainty, it cannot be said that any of those issues are immaterial.